**TEXAS AND NEW ORLEANS BARGE LINE, INC.**

v.

**TUG PATSY H, her engines, tackle, apparel, furniture, and appurtenances and Nagel Towing Co., Inc., and James Nagel, Jr., and Virginia Nagel.**

No. 908.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Feb. 12, 1968.

William L. Von Hoene, Morgan, Von Hoene & Becker, New Orleans, La., for libelant.

Frank M. Coates, Jr., Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for respondents.

WEST, Chief Judge:

Libelant, Texas and New Orleans Barge Line, Inc., brings this suit to recover what it alleges to be the balance due under a charter party entered into between it and the respondents on March 16, 1965, together with other debts connected therewith which are also alleged

to be due and payable. There is very little, if any, real dispute about the facts involved in this case.

On March 16, 1965, libelant, as the owner of the Tug PATSY H, entered into a bareboat charter party with respondent, Nagel Towing Co., Inc., whereby the Tug PATSY H was chartered to said respondent for a period of forty-eight months. The charter party was signed on behalf of libelant by Jack Neilson, President of Texas and New Orleans Barge Line, Inc., and on behalf of respondents by James Nagel, President of Nagel Towing Co., Inc., and by James Nagel, individually, and by Virginia Nagel, individually. The charter hire was set in the charter party at $2,500 per month for the first twelve months, and $1,900 per month for the subsequent thirty-six months. Respondents paid seven monthly payments of $2,500 each and then defaulted. Only two of these payments were actually made on time, the others being tardily made.

On December 29, 1965, respondents, through Mr. Nagel, returned the tug to libelant with the explanation that it was unable to make further payments. Upon request, libelant told Mr. Nagel where to leave the tug and it remained at the designated place until May 16, 1966. On that day libelant chartered it to a third party for $1,500 per month and received twelve monthly payments pursuant to that agreement. Libelant now seeks to recover from respondents the total amount that it would have received had respondents kept the tug without defaulting for the entire forty-eight months, less the seven payments made by respondent and less the sum of $18,000 received as charter hire from the third party under the agreement of May 16, 1966, together with the sum of $3,018 for rigging and supplies allegedly owed by respondents. Respondents answer claiming that because of the fact that the charter party contained a provision allowing Nagel Towing Co., Inc. to purchase the tug at a stipulated price at the termination of the charter period, it was not really a charter agreement at all but rather amounted to a sale of the tug to respondents. Respondents then argue that under Louisiana law, particularly the Louisiana Deficiency Judgment Act, LRS 13:4106–13:4107, it would be against public policy to allow libelant to recover for "rentals" owed at the time the vessel was surrendered. The Court finds no merit to these contentions. In a charter party the parties may contract as they choose, J. B. Effenson Co. v. Three Bays Corp., 5 Cir., 238 F.2d 611, and they are, of course, bound by the terms of the contract as written. When considering the charter party here involved, the Court finds nothing contained therein that could be construed to be against public policy, nor is there anything ambiguous about it. In an action on a bareboat charter, the District Court's function is not to re-write the charter agreement but to interpret it. B. H. Inc. v. Anthony M. Meyerstein, Inc., D.C., 149 F.Supp. 219. This charter party was a bareboat rental of the Tug PATSY H for a specified time at a specified price and nothing else. It was not a sale.

The real question presented though is, under the circumstances of this case, and under the terms of the charter party, how much of the total charter hire, if any, may the libelant now recover. Libelant argues that it is entitled to recover the total amount provided for in the agreement less the credits above referred to. Respondents, on the other hand, contend that if the agreement was not a sale, libelant is entitled only to rental payments up to May 23, 1966, the date it contends the charter party was terminated, subject to certain credits hereinafter discussed. After considering the provisions of the charter agreement, and the actions taken by libelant after respondents defaulted, the Court concludes that the charter party was, in fact, actually terminated by libelant on May 16, 1966.

Article I of the charter party provides:

"Owner agrees to and does hereby charter bareboat, and Charterers agree

to and do hereby hire bareboat, under the terms and conditions set out in this Charter 'as is' when delivered to Charterers, the PATSY H hereinafter referred to as 'Vessel', together with spare parts, tackle, apparel, furnishings and equipment now on board the Vessel, for a period of forty eight months beginning with the delivery of the Vessel to Charterers, afloat in the New Orleans area, Owner's Option, and expiring forty eight months thereafter, the expiration day, unless prior to the expiration day the Vessel shall become a total loss, actual or constructive (as constructive total loss shall be defined in the policies of insurance hereinafter referred to), or unless this Charter is sooner cancelled as hereinafter provided; that time from the beginning day to the expiration day is sometimes herein referred to as the 'charter period'."

And Article XIII provides, in pertinent part, as follows:

"If Charterers fail to pay charter hire or other amount herein provided after the same is due and payable, or if Charterers fail to observe, keep or perform any other provisions of this charter party required to be observed, kept or performed by charterers, Owner shall have the right to exercise any one or more of the following remedies:

"a) To declare the entire amount of charter hire hereunder immediately due and payable without notice or demand to Charterers.

"b) To sue for and recover all charter hire, and other payments, then accrued or hereafter accruing.

"c) To take possession of the Vessel, without demand or notice, where-ever same may be located, without any court order or any process of law. Charterers hereby waive any and all damages occasioned by such taking of possession. And said taking of possession shall not constitute a termination of this charter party unless Owner expressly so notifies Charterers in writing.

"d) To terminate this charter party.

"e) To pursue any other remedy of law, admiralty or in equity. Notwithstanding any repossession, or any other action which Owner may take, Charterers shall be and remain liable for the full performance of all obligations on the part of Charterers to be performed under this charter party. All such remedies are cumulative and may be exercised concurrently or separately."

Of the several options available to libelant under Article XIII quoted above, it availed itself of the one provided by subsection (d), i. e., "to terminate this charter party."

■ On or about December 29, 1965, when respondent realized it could no longer pay the charter hire on the tug, Mr. Nagel simply called Mr. Neilson, libelant's President, and said he was returning the boat and asked where to leave it. Mr. Neilson designated some place in Harvey, Louisiana, and the vessel was delivered there by respondent. At that time, libelant could have exercised its option under sub-paragraphs (2) or (b). But it did not do so. It simply did nothing, and hence the charter party, according to its terms, remained in full force and effect. When libelant accepted possession of the vessel on December 29, such action, of itself, did not terminate the contract. Sub-paragraph (c) specifically provided that the mere taking of possession by the owner would not, of itself, terminate the contract. But on May 16, 1966, libelant did something else. It chartered the vessel to a third party without in any way advising or consulting with the respondent concerning the new charter party. This action did not amount to pursuing "any other remedy of law, admiralty or in equity" as contemplated in sub-paragraph (e) of the charter party, and hence the remaining provisions of that sub-paragraph are inapplicable. The action taken by libelant on May 16, 1966, was not legal action, it was purely private or individual action which, in the opinion of this Court, constituted a termination of the charter party as contemplated by sub-section (d) of the

contract. Under that provision no formality such as written notice, etc. is required. It merely gives libelant the right, in case of respondents' default, to "terminate this charter party." The precise method to be used by libelant to terminate the agreement was not specified. This Court concludes that the re-chartering of the vessel to a third party on May 16, 1966 effectively terminated the charter party agreement between libelant and respondents, leaving libelant the right to sue for and to collect all amounts that might be due by respondents up to that date, and no more. Paragraph VII of the libel filed herein by libelant clearly shows that libelant intended to terminate the charter party when it re-chartered the vessel on May 16, 1966. In that paragraph libelant says "Libelant, in view of the foregoing, has the right to repossess and to withdraw the TUG PATSY H from the services of Nagel Towing Co., Inc. and to terminate the agreement dated March 16, 1965." Thus there is no question but that libelant intended to and did in fact exercise its option to terminate as provided for by Article XIII(d) of the charter party. Libelant recognized the limitation on the amount of its recovery when it filed this libel seven days after it terminated the charter party on May 16, 1966. In Paragraph VIII of its libel libelant demands "payment of $11,280.23 representing charter hire presently due and owing pursuant to the terms and conditions of said agreement." How libelant arrived at that figure is not known to this Court because the amount of charter hire due as of May 16, 1966, according to the terms of the charter party, was the sum of $33,800, LESS the seven payments of $2,500 each previously made by respondents, leaving a balance due of $16,300. The proofs adduced show this amount to be due as charter hire up to May 16, 1966, and the Court therefore must assume that whoever drafted this libel was simply a poor mathematician. The provision in the libel demanding payment of amounts due up to the time of termination of the charter party would control over the exact figure stated which obviously is simply a miscalculation of the amount actually due according to the proofs.

Libelant further demands the sum of $3,018, representing an amount allegedly owed by respondents for rigging and supplies placed upon the vessel at the time it was initially turned over to respondents under the charter party agreement. There is no real dispute about this item, and the evidence clearly shows that libelant does have a right to recover this amount from the respondent, Nagel Towing Co., Inc. But the evidence further shows that neither James Nagel, Jr., nor Virginia Nagel individually assumed any responsibility for this debt. Thus the respondents, Nagel Towing Co., Inc., James Nagel, Jr. and Virginia Nagel are liable in solido to libelant for the sum of $16,300 under the charter party, and in addition thereto, Nagel Towing Co., Inc. is liable to libelant for the additional sum of $3,018 for rigging and supplies. But against the $16,300 respondents claim certain offsets. While there are some differences in the amounts of the offsets claimed by respondents and those admitted by libelant, the Court concludes from the evidence that respondents are entitled to the following offsets:

| | |
|---|---:|
| Phone bill paid by respondents | $ 102.85 |
| Damages caused by delay of vessel due to seizure for debt of libelant | 500.00 |
| Miscellaneous towing and other services rendered to libelant by respondents | 4,555.00 |
| Repairs to rudder authorized by libelant and paid for by respondents | 423.00 |
| Repairs to grid coolers authorized by libelant and paid for by respondents | 331.09 |
| TOTAL .......... | $5,911.94 |

The other items of offset claimed by respondents, i. e., insurance premium in the amount of $491.60; cost of repairing armature in the amount of $622.32; cost of repairs to steering cable in the sum of $158.05; and cost of engine overhaul

in the amount of $377.99 are disallowed, it being the opinion of this Court that the payment of all of those items by respondents is clearly provided for by the terms of the charter party.

Thus, libelant is entitled to recover from respondents, Nagel Towing Co., Inc., James Nagel, Jr. and Virginia Nagel, in solido, the sum of $16,300, LESS a total offset of $5,911.94, or a net amount of $10,388.06, and libelant is further entitled to recover from Nagel Towing Co., Inc. the sum of $3,018, both awards to bear interest at the legal rate from date of judgment until paid. Judgment will be entered accordingly.